**MIAMI AREA LOCAL, AMERICAN POSTAL WORKERS UNION, AFL–CIO, on its behalf and on behalf of its members, Plaintiff,**

v.

**UNITED STATES POSTAL SERVICE and The American Postal Workers Union, Defendants.**

No. 01–4423–CIV.

United States District Court, S.D. Florida.

Nov. 16, 2001.

Neil Flaxman, Esq., Neil Flaxman, P.A., Coral Gables, FL, for Plaintiff.

Lawrence Rosen, AUSA, Miami, FL, John C. Oldenburg, Esq., Memphis, TN, for Defendant USPS.

George Tucker, Esq., Coral Springs, FL, for Defendant APWU.

## ORDER DENYING PLAINTIFF'S MOTION FOR EMERGENCY INJUNCTIVE RELIEF

SEITZ, District Judge.

On Monday, October 29, 2001, Plaintiff Miami Area Local, American Postal Workers Union, AFL–CIO ["Miami Local"] filed a Motion for Emergency Injunctive Relief [DE–4], requesting that the Court direct Defendant United States Postal Service ["USPS"] to expedite the arbitration of a safety grievance filed by the local union chapter of the American Postal Workers Union ["APWU"].[1] The Court conducted a preliminary hearing on this Motion on October 31, 2001, and took evidence and heard testimony from the parties from November 2, 2001 through November 9, 2001. After review of the record and the applica- ble law, the Court DENIES Miami Local's Motion for the reasons stated below.

## PROCEDURAL AND FACTUAL BACKGROUND

In October of 2001, the United States struggled through the first widely-known bio-terrorist attack of the twenty-first century as law enforcement officers, scientists, postal workers, and ordinary citizens confronted a scourge of anthrax spores traced to letters apparently sent through the mail.[2] On October 5, 2001, medical authorities confirmed that Bob Stevens, an employee of American Media, Inc. ["AMI"], in Boca Raton, Florida, died after inhaling anthrax spores. Medical authorities later confirmed a second case of inhalation anthrax at AMI in Boca Raton, which was successfully treated. Throughout the month, law enforcement officers found anthrax-tainted correspondence on Capitol Hill and at numerous media outlets, and discovered anthrax linked to confirmed anthrax cases at the West Trenton post office and Hamilton Township mail center in New Jersey, the Brentwood mail center in the District of Columbia, and the mail center at the State Department headquarters. The Centers for Disease Control and Prevention ["CDC"] in Atlanta, Georgia, confirmed that there were sixteen cases of anthrax (and four anthrax-attributed deaths) in October. Anthrax felled two postal workers.[3] To date, investiga-

---

1. Miami Local named the national APWU organization as a Defendant pursuant to Federal Rule of Civil Procedure 19, which governs joinder of parties whose absence would either materially reduce the likelihood that the court can provide justice for those already parties or be detrimental to the non-parties themselves. Fed.R.Civ.P. 19(a).

2. USPS Management Instruction dated October 4, 1999 defines anthrax as: "an acute infectious disease caused by *bacillus anthracis*. Spores enter the body through open wounds, cuts, or mucous membranes (mouth, nose) or are inhaled or ingested. Humans usually get the disease by coming into contact with spores of infected animals (cattle, sheep, goats) or their products. It is probably not transmitted from person to person, and a person with anthrax is not contagious. *Bacillus anthracis* spores can cause disease in 2 to 60 days. Individuals who have been identified as having had an exposure to anthrax may be treated by medication."

3. Funeral services were held for Thomas Morris Jr., on Oct. 26, 2001, and for Joseph Curseen Jr. on Oct. 27, 2001. Both worked at the Brentwood, D.C. postal sorting facility and died from inhalation anthrax.

tors have found traces of anthrax spores at six postal facilities in the Postal Service's Central District of Florida. All of these facilities have been decontaminated.[4] No facilities in the Postal Service's Southern District have tested positive for anthrax, and no Florida postal workers have tested positive for exposure to anthrax. Although limited in scope, these unpredictable and grave attacks set the nation on edge.

On October 23, 2001, Miami Local[5] filed a Step 2 Grievance with USPS under the current Collective Bargaining Agreement ["CBA"] between national APWU and USPS.[6] In its grievance, Miami Local requested corrective action in the form of protective equipment, testing of all facilities and employees that may handle "suspicious mail," and paid administrative leave for hours lost due to suspicious mail or testing thereof.[7] Six days later, on October 29, 2001, Miami Local filed the instant case, reiterating the charges raised in its grievance. In its Preliminary Injunction Motion, Miami Local requested an Order requiring arbitration on an expedited basis, stating that:

[T]here appears to be no policies which concern the [Miami Local] as ... to matters concerning sweeps to determine if anthrax is present, testing of employees for anthrax, administrative leaves to employees for physical and psychological treatment, protective equipment such as gloves and face masks, and other health and safety matters, and such policies differ from location to location with no definitive policy for the jurisdiction of the [Miami Local].

. . .

Without immediate arbitration to resolve the above stated issues, irreparable harm will be done [to the Miami Local] and its members since postal workers will suffer actual and psychological damage due to anthrax.

(Pl.'s Compl. at 6). On November 2, 2001, the USPS responded to Miami Local's grievance, noting that "the relief the grievance requests, that window clerks be al-

---

**4.** Of the six Florida facilities testing positive for anthrax, two are in Boca Raton (within the Miami Local's jurisdiction), and four are in West Palm Beach (outside of the Miami Local's jurisdiction). The Boca Raton facility is in the Postal Service's Central District of Florida. The remaining facilities in the Miami Local's jurisdiction are in the Postal Service's Southern District of Florida.

**5.** Although referred to as "Miami Local" in this Order and other official papers, the local union's jurisdiction covers Miami, Hialeah, Homestead, Broward County, and Boca Raton in Palm Beach County. (See Compl. at 3.) The Miami Local represents approximately 4,000 postal workers. These do not include letter carriers.

**6.** The 1998–2000 National Agreement between the United States Postal Service and the American Postal Workers Union, AFL–CIO is the existing collective bargaining agreement establishing the rights and obligations of the parties in this matter.

**7.** The Grievance alleged, in pertinent part:

USPS in the Miami Installation has failed in its duty to protect employees in the incidents of anthrax. Employees have been denied the right to wear protective equipment (gloves and masks).... [S]ome supervisors have engaged in disposing pieces of mail reported as suspicious prior to being tested. [I]n places like Boca Raton where residues of Anthrax have been found[,] management has selectively tested only some employees, regardless of the possibility of airborne particles. The postal service has left employees [i]n imminent danger.... They have taken the attitude to react only after someone is exposed or dea[d] rather than preventing it.... Management application of this policy varies with each unit in that some clerks are allowed to wear gloves and are provided work out of the public view while other clerks are simply told that they cannot wear gloves and must work at the [customer service] window. (Pl.'s Not., Oct. 31, 2001, at 2.)

lowed to wear masks at the window, conflicts with [the] national policy that was developed in light of the obligations of Article 14 of the National Agreement (Safety and Health) in consultation and dialogue with the National APWU." [8] Miami Local's grievance has been elevated to the national level because it involves an interpretive issue of general application. Because circumstances have evolved and most of the issues raised in the grievance have been resolved, on November 6, 2001, Miami Local stipulated that the only issues remaining before this Court are: (1) whether Miami Local is entitled to an Order, contrary to national policy, permitting window clerks to wear face masks when serving customers at the window pending arbitration; and (2) whether the Court may order arbitration on an expedited basis.

Based upon the testimony and exhibits the parties presented, the Court finds that since October 10, 2001, the USPS and the national APWU have been engaged in comprehensive, collaborative efforts to address the health and safety concerns of postal employees nationwide. The Postal Service and national APWU keep postal employees informed of events, news, and analysis through mandatory safety talks, printed and electronic disseminations, and toll-free numbers.[9] (Def.'s Ex. 5 & 6). In addition, USPS officials have consulted at length, with officials from the CDC and other specialists to determine how to protect postal employees from the anthrax threat. (Def.'s Ex. 2). Postmaster General Potter and his management team have been meeting daily with presidents of the postal unions and the heads of organizations representing nonunion postal employees in an effort to seek "the best and most sophisticated medical, scientific and engineering information available to meet this threat." (*Id.*). The Postal Service has followed the CDC's advice on the proper medical and preventative response to the anthrax threat. Moreover, the national APWU and USPS have agreed to close and decontaminate postal facilities where anthrax is found. In facilities where no trace of anthrax is found, the Postal Service has begun to issue protective equip-

---

8. The Postal Service's response to the Grievance further stated in relevant part that:

  National postal policy is that those employees whose positions bring them into direct public contact are not allowed to wear masks while dealing directly with the public. Window clerks thus may not wear masks while performing retail services. There is no indication that customers dealing with window clerks over the counter have introduced anthrax-tainted mail into the mail stream. Such contacts are face-to-face and necessarily expose the customer who is doing a particular mailing to at least the same potential exposure as the window clerk.

  Nonetheless, window clerks are still free under the national policy to choose to wear masks. Any clerk who does so, however, is assigned to non-window duties consistent with his job description. This approach is taken to avoid adversely affecting the public and the public image of the Postal Service.

  Thus, the Postal Service allows window clerks to wear masks while still implementing its policy that employees in direct public contact are not presented to the public while wearing them.

9. In addition to the daily, and even hourly, information the Postal Service provides to its employees, the national APWU has disseminated information concerning safety procedures on a continuous, daily basis to local union members through its website and telephone message service, as well as weekly, national teleconferences with hundreds of APWU members and other postal employees. (Gary Kloepfer Test., Nov. 2, 2001). Among other things, the national APWU website offers postal workers and the general public information on the following: (1) supervisors' and managers' responsibilities; (2) USPS Newsbreak informational updates; (3) USPS policies on gloves and masks; (4) CDC health advisories; and (5) USPS cleaning policies. *See www.apwu.org.*

ment, including respirators and gloves;[10] and environmental testing is being pursued aggressively. No postal employee has been asked to work in a facility known to be contaminated. (*Id.*).

The Postal Service has also provided reminders to all postal workers of their access, 24–hours–a–day, 365–days–a–year, to the information and resources of an Employee Assistance Program ("EAP") provided by Magellan Behavioral Health, an independent medical managed care company. (Cynthia Copp Test., Nov. 8, 2001). By calling EAP's 1–800 number, postal workers can receive confidential, personal counseling from licensed counselors on dealing with stress in the workplace. (*Id.*) Postal supervisors and managers may utilize EAP's services to receive tips on dealing with employees' reactions to the threat of anthrax. (Def.'s Ex. 13).

The national APWU and USPS have also developed a "Quick Dispute Resolution Procedure" ("QDRP") to correct any local interpretations of the national policy to provide maximum protection to every employee.[11] The QDRP is a four step procedure commencing with an employee initiating the process by contacting his Local President. If the issue is not resolved, the dispute is elevated to the National Business Agent. If the dispute remains unresolved, the issue is then sent to the Regional Coordinator. The final step culminates with the dispute being elevated

and discussed by Postmaster Potter with national APWU President Burrus at their daily meetings. The goal of the QDRP is to resolve every issue within a twenty-four hour time period. The Miami Local is aware of the QDRP but has elected not to utilize this procedure.

Although the CDC has made certain interim recommendations for protecting postal workers from exposure to anthrax, the CDC has not recommended that window clerks wear masks while serving customers at the window. (Def.'s Ex. 18). It is reasonable for the USPS to rely on the recommendations of the CDC regarding the appropriate response to the anthrax threat because it is the accepted medical authority. (Bernd Wollschlaeger Test., Nov. 8, 2001).

Pursuant to existing national policy, window clerks may not wear masks while working at the window. (Jesus Galvez Test., Nov. 8, 2001). If a window clerk is uncomfortable working at the window without a mask, the Postal Service will accommodate that person, and ensure that the employee is provided with work elsewhere in the facility where masks are permitted. (*Id.*) Although the evidence is unclear, it appears that twenty percent of the 300 postal window clerks remain concerned about their health because they are not permitted to wear protective face masks while serving customers at the window.[12] (Cindy Paz Test., Nov. 6, 2001;

---

**10.** It is undisputed that the USPS and national APWU are providing gloves and masks to every postal employee who requests such protective gear. The USPS has spent more than $86,000 in South Florida for the purchase of more than 37,000 masks and 300,000 pairs of gloves to ensure the health and safety of postal workers. (JoAnn Feindt Test.., Nov. 9, 2001). This quantity has been sufficient to meet the demand for such protective gear in the South Florida district, and in fact, the USPS has had to reduce the quantity purchased. (*Id.*) Although not all postal workers are using gloves and masks, JoAnn Feindt, the

acting District Manager for the South Florida cluster has encouraged their use.

**11.** This procedure was publicized in an October 29, 2001 APWU News Service notice posted on union bulletin boards nationwide.

**12.** The exact number of window clerks that want to wear masks at the window is unclear because Miami Local has not conducted a formal poll of all 300 window clerks. Rather, Miami Local has arrived at its figure by means of informal polling, discussions with shop stewards, and the testimony of a non-

Frank Annunziato Test., Nov. 5, 2001).

## DISCUSSION

This case involves a dispute concerning the terms and application of the CBA and Local Memorandum of Understanding ["LMU"] [13] between the Miami Local and the USPS. Therefore, this Court has jurisdiction to address Miami Local's Motion for Emergency Injunctive Relief. *See* 39 U.S.C. § 409(a) (furnishing federal courts with "original but not exclusive jurisdiction over all actions brought by or against" USPS); *id.* § 1208(b) ("[s]uits for violation of contracts between [USPS] ... and a labor organization representing Postal Service employees ... may be brought in any district court of the United States").[14]

Miami Local contends that "an order compelling expedited arbitration is necessary to assure the efficacy of arbitration to resolve the parties' disputes." (Compl. at 8). However, USPS maintains that expedited arbitration with the Miami Local would only impede its efforts to implement a consistent, national policy for safeguarding the health of postal workers from anthrax exposure. (*See* Tr., Oct. 31, 2001.) Both parties are grappling with a novel, perplexing threat to the postal system, and clearly seek to protect the health, safety and welfare of all postal workers. Miami Local candidly admits it does not disagree with what the Postal Service has done. It simply disagrees with the speed at which the Postal Service has implemented its policies.

The Court has no authority to dictate policy to the Postal Service or its employees. It is a basic principle of federal labor law that when a collective bargaining agreement provides a contractual means for dispute resolution, the parties must exhaust their contractual remedies before resorting to the courts. *See Republic Steel Corp. v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965). The use of an agreed-upon grievance-arbitration procedure in resolving disputes involving terms of the collective bargaining agreement is a central feature of national labor relations policy. *See United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 580–82, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). Where the parties have agreed to a detailed grievance-arbitration procedure, the Court must act with great restraint in determining whether to intervene. *See Independent Oil & Chemical Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.,* 864 F.2d 927, 929 (1st Cir.1988) ("[C]ourts should intervene only when necessary to preserve the mechanisms of peaceful arbitration or when circumstances of imminent, irremediable harm threaten.").

---

treating psychologist who examined 65 shop stewards for three hours.

**13.** Under Article 30 of the National Agreement, the Miami Local can negotiate issues related to safety and curtailment or termination of postal operations because of emergency situations. Pursuant to the Local Implementation of the 1998 National Agreement, on April 15, 1999, the USPS and the designated agent of the national APWU, Gil Santana, the General President of the Miami Area Local, entered into a Local Memorandum of Understanding. The relevant provision, Item #3, provides that

"[w]hen an alleged explosive device has been discovered or a threat has been made against the Postal Facility and verified by the Installation Head, and/or his designee, the facility shall be completely evacuated until all safety measures have been taken by the proper authorities."

**14.** By stipulation of the parties and without prejudice to the position of the Postal Service in future proceedings between the Postal Service and the Miami Local, Defendants do not contest Miami Local's capacity to sue under § 1208(b) in this action.

Therefore, because the parties in this case have entered into a CBA that provides for a grievance-arbitration procedure, this Court must limit its inquiry to whether Miami Local has satisfied the four prerequisites for obtaining injunctive relief.

## Standard of Review for Injunctive Relief

To obtain a preliminary injunction, Miami Local must prove: (1) that there is a substantial likelihood that it will prevail on the merits; (2) that there is a real threat of irreparable injury if the injunction is not granted; (3) that the threatened injury outweighs the threatened harm an injunction may impose on the defendant; *and* (4) that granting the preliminary injunction will not disserve the public interest.[15] *Suntrust Bank v. Houghton Mifflin Co.*, 252 F.3d 1165, 1166 (11th Cir.2001) (citing *Warren Publ'g, Inc. v. Microdos Data Corp.*, 115 F.3d 1509, 1516 (11th Cir.1997)). The preliminary injunction is "an extraordinary and drastic remedy that should not be granted unless the [plaintiff] clearly carries its burden of persuasion on each of these prerequisites." *Suntrust Bank*, 252 F.3d at 1166 (citing *Canal Authority of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974)).[16]

### 1. Likelihood of Success on the Merits

■ To satisfy the likelihood of success on the merits prong, the Court need only find that the position the plaintiff will espouse in arbitration is "not frivolous and is sufficiently sound to prevent the arbitration from being a futile endeavor." *Int'l*

*Bhd. of Elec. Workers Sys. Council v. Fla. Power & Light Co.*, 678 F.Supp. 257, 258 (S.D.Fla.1987) (citing *Aluminum Workers Int'l Union v. Consol. Aluminum Corp.*, 696 F.2d 437 (6th Cir.1982); *Local Lodge No. 1266 v. Panoramic Corp.*, 668 F.2d 276 (7th Cir.1981)). The issue for the Court under this prong of the test is simply whether the matter is subject to arbitration. The Court cannot determine the propriety of either the Miami Local's grievance or the USPS' national window clerk mask policy, because these matters are exclusively reserved to the parties' arbitration process. *See Florida Power & Light Co.*, 678 F.Supp. at 258. The parties have stipulated that the face mask issue is subject to arbitration. Thus, the Court finds that Miami Local has satisfied this first prong.

### 2. Irreparable Injury

■ Miami Local must also establish that there is a real threat of irreparable injury if the injunction is not granted. *Northeastern Florida Chapter of the Assoc. of General Contractors of Amer. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990) (citing *United States v. Lambert*, 695 F.2d 536, 540 (11th Cir. 1983)). To establish irreparable injury, Miami Local must prove that the injury it will suffer is "neither remote nor speculative, but actual and imminent." *City of Jacksonville*, 896 F.2d at 1285. The possibility that Miami Local will obtain adequate relief at a later date, in the ordinary course of arbitration, weighs heavily against a claim of irreparable injury. *See id.* (citing *Sampson v. Murray*, 415 U.S.

---

**15.** Miami Local, as movant, bears the burden of proving all four prerequisites. *See Nnadi v. Richter*, 976 F.2d 682, 690 (11th Cir.1992).

**16.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974)).

Miami Local's claim of irreparable injury is two-fold. First, it claims that the postal workers will suffer irreparable injury from the fear and stress that flows from not being permitted to wear masks at the window. Second, it claims that without arbitration on an expedited basis, the arbitration process will be a nullity.

As to its first claim, while it is true that there are window clerks who suffer from heightened levels of fear and stress because they are not permitted to wear masks while working at the window, the record is devoid of any evidence that their fear is based on an actual threat, or that any postal worker in Florida has suffered actual and imminent harm as a result of anthrax exposure. The CDC, the accepted medical authority, has indicated that there is no evidence at present that postal window clerks face an actual and imminent, or even an appreciable risk of contracting anthrax while servicing customers at the window.[17] Therefore, the Court finds that this first claim of injury alleged by Miami Local is both remote and speculative.

As to its second claim, given the speed at which all of the other issues raised in Miami Local's grievance have been resolved at the national level, the Court must conclude that it is more likely than not that the Postal Service and the national APWU will address the remaining face mask issue in the same expeditious manner. Therefore, the Court finds that Miami Local has failed to establish irreparable injury as to both of its claims.

### 3. Balancing of the Hardships and the Public Interest

■ Miami Local must also prove that the threatened injury outweighs the threatened harm an injunction may impose on the defendants. *Suntrust Bank,* 252 F.3d at 1166. Miami Local suggests that an Order requiring expedited arbitration will cause no harm to the Postal Service because the parties have a common goal, namely the health and safety of postal workers. Miami Local asserts that its approach is pro-active, while the Postal Service's approach is re-active. (Pl.'s Compl. at 8). However, this oversimplifies the complex nature of the threat which is one that faces all of the nation's postal workers and thus, is one of national scope and importance, requiring teamwork, concerted national planning, information sharing, and unified commitment of resources. In times of uncertainty and heightened fear, as even Miami Local's psychologist opined, a collaborative process, such as mediation, rather than the adversarial process involved in arbitration, is preferred.

The public has a substantial interest in having matters of national scope and importance dealt with on a national level. It is precisely in times such as these, that the Postal Service must utilize its limited resources in an efficient and effective manner. To force the Postal Service to address issues of national scope on a piecemeal and ad-hoc basis would hamper the unitary leadership and efficient use of resources that is required. Therefore, the Court finds that Miami Local has failed to establish that the threatened injury outweighs the threatened harm an injunction may impose on the defendants, and that

---

**17.** According to the CDC, "[p]ersons working with or near machinery capable of generating aerosolized particles (e.g. electronic mail sorters) or at other work sites where such particles may be generated should be fitted with [masks]...." (Def.'s Ex. 18). Dr. Wollschlaeger testified that window clerks are not subject to risk of inhalation anthrax because no means exists at the window, such as the "bellows" effect of a mail-processing machine, to disperse anthrax into the air in either a dangerous amount or in a manner sufficient for inhalation.

granting the preliminary injunction will not disserve the public interest.

## CONCLUSION

All of the parties, as well as this Court, recognize that this nation's postal workers have shown remarkable courage and dedication during these times of great uncertainty. The nation is indebted to them because without their combined efforts, the mail service on which the country depends for communication and commerce would cease. Thus, the parties' primary goals must be: (1) to protect the health and safety of all postal workers; (2) to allay any fears that the public might have as to the safety of our country's mail system; and (3) to maintain the efficient operation of the Postal Service. Amidst what many in the public perceived to be moments of crisis and chaos, the leadership within the USPS and the national APWU has remained calm, unified, and forthright in laying out policy and carrying out its procedures. All evidence indicates that the Postal Service and national APWU will continue their efforts to expeditiously address the concerns of all postal workers throughout the nation.

For the foregoing reasons, it is hereby

ORDERED that Plaintiff Miami Local's Motion for Emergency Injunctive Relief [DE-4] is DENIED.