UNITED STATES OF AMERICA

v.

William QUILLEN, Appellant.

No. 02–3059.

United States Court of Appeals,
Third Circuit.

Argued March 14, 2003.

Filed July 10, 2003.

**220**

Shelley Stark, Federal Public Defender, Thomas W. Patton (Argued), Assistant Federal Public Defender, Office of Federal Public Defender, Erie, PA, for Appellant.

Mary Beth Buchanan, United States Attorney, Christine A. Sanner (Argued), Assistant United States Attorney, Bonnie R. Schlueter, Office of United States Attorney, Pittsburgh, Marshall J. Piccinini, Office of United States Attorney, Erie, PA, for Appellee.

Before BECKER,\* Chief Judge, RENDELL and AMBRO, Circuit Judges.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

William Quillen, while an inmate in the Pennsylvania prison system, mailed to the state parole board a threatening letter that contained a powdery substance. Suspecting it was anthrax (it was not), the authorities' response included a cleanup by a hazardous materials ("hazmat") team. After Quillen pleaded guilty, the District Court approved the Government's request for approximately $4,000 in restitution costs. Quillen appeals, asserting that the relevant federal statute does not authorize restitution in these circumstances where his conduct did not actually damage the victim's property. We reject this argument, and affirm the District Court's decision.[1]

### I.

On October 19, 2001, the headquarters of the Pennsylvania Board of Probation and Parole in Harrisburg received an envelope bearing the return address of Edward Nicholas at the State Correctional Institution (SCI) in Albion, Pennsylvania, where Nicholas was an inmate. When a Parole Board staffer opened the envelope, a white, powdery substance spilled out from a letter that stated: "For your infor-

---

\* Judge Becker concluded his term as Chief Judge on May 4, 2003.

1. We have jurisdiction pursuant to 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

mation I would like to point out how easy it is to eliminate the entire board. You need to be more careful when dealing with us, when determining us for parole. The wrong person could do some drastic things." In October 2001, bioterror attacks involving anthrax-laced letters had taken place in Florida, Washington, D.C., and New Jersey, killing four people.[2] Because of heightened concern over anthrax mail attacks, the Parole Board area was sealed off and the Harrisburg police and fire departments responded along with the Dauphin County Hazardous Materials Team.

Officials at SCI–Albion launched an investigation and began by interviewing Nicholas, the ostensible author of the letter. He denied any involvement, but opined that another inmate may have sought retaliation for Nicholas's having exposed a scheme in which prisoners exchanged sandwiches smuggled from the kitchen for cigarettes. Nicholas named three inmates with the motive to frame him, including Quillen. Investigators interviewed Quillen on October 22nd and he admitted writing the letter, placing baby powder and powdered sugar in the envelope, and mailing it to the Parole Board in an effort to have Nicholas punished.

Quillen was charged in the Western District of Pennsylvania with mailing a threatening communication, in violation of 18 U.S.C. §§ 876 and 2(b). Pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, the Parole Board filed a victim impact statement seeking $1,175.00 for salaries and benefits,

$4,026.55 for hazmat clean-up costs, $122.00 for reimbursement for damaged personal property, and $9,991.50 for a specially designed mail room. Quillen objected to all except the $122.00 reimbursement for damaged personal property. The Government adjusted the statement, determining that only $42.75 in overtime pay was appropriate and that the cost of constructing the new mail room should not be included in the restitution order. But it reiterated that the full $4,026.55 in hazmat clean-up charges was directly attributable to Quillen's actions, and therefore compensable. In sum, the Government sought restitution in the amount of $4,191.30 ($42.75 in overtime salaries, $4,026.55 in hazmat clean-up costs, and $122.00 to reimburse damaged personal property).

At his sentencing hearing, Quillen again challenged the amount of the Government's request. The District Court disallowed the overtime pay as a consequential loss not covered by the MVRA, but found that the hazmat clean-up cost was an actual loss suffered by the victim and thus recoverable as restitution. Accordingly, the District Court imposed costs of $4,148.55.[3]

■ "We review a restitution order 'under a bifurcated standard: plenary review as to whether restitution is permitted by law, and abuse of discretion as to the appropriateness of the particular award.'" *United States v. Simmonds*, 235 F.3d 826, 829 (3d Cir.2000) (quoting *United States v. Crandon*, 173 F.3d 122, 125 (3d Cir.1999)). Quillen challenges only the legality of the

---

**2.** As noted by one federal court in an action involving postal employees and safety issues arising from the October 2001 anthrax mailings, "[a]lthough limited in scope, these unpredictable and grave attacks set the nation on edge." *Miami Area Local, Am. Postal Workers Union, AFL–CIO v. United States Post-*

*al Serv.*, 173 F.Supp.2d 1322, 1324 (S.D.Fla. 2001).

**3.** The District Court also sentenced Quillen to a 40–month term of imprisonment, to run consecutive to his current imprisonment, followed by three years of supervised release.

restitution order and not the amount of the award; thus our review is plenary.

## II.

■ "As its name suggests, the Mandatory Victims Restitution Act, which was enacted by Congress in 1996, mandates that defendants who are convicted of or plead guilty to certain crimes pay restitution to their victims." *Id.* at 830. The purpose of the statute is, "to the extent possible, to make victims whole, to fully compensate victims for their losses, and to restore victims to their original state of well-being." *Id.* at 831. Under the MVRA, "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered...." 18 U.S.C. § 3663A(a)(2). In offenses involving the damage or loss of the victim's property, the restitution order shall require that the defendant return the property or, if return is impossible, "pay 'an amount equal to the greater of the value of the property on the date of the damage, loss, or destruction; or the value of the property on the date of the sentencing, less the value (as of the date the property is returned) of any part of the property that is returned.'" *Simmonds*, 235 F.3d at 830 (quoting 18 U.S.C. § 3663A(b)(1)(B)). Because the property damaged in this case – the Parole Board's mail room – was not taken, obviously its "return" could not be ordered. Thus the District Court's only practical option was to order Quillen to pay the cost of ensuring that the mail room was in the same condition as just prior to the time it became unusable.

■ We have interpreted § 3663A(b)(1) not to authorize "consequential damages." *Id.* at 833 (citing *Gov't of Virgin Islands v. Davis*, 43 F.3d 41, 45 (3d Cir.1994)). Instead, restitution must be limited to "an amount pegged to the *actual* losses suffered by the victims of the defendant's criminal conduct," and "based upon *losses directly resulting* from such conduct." *Davis*, 43 F.3d at 45 (quoting *United States v. Barany*, 884 F.2d 1255, 1260–61 (9th Cir.1989)).[4] Quillen's argument, stated simply, is that his conduct did not "actually damage" the Parole Board's mail room. After all, the substance he enclosed in the envelope, baby powder and powdered sugar, literally was harmless and effected no contamination. As a result, he contends, the hazmat clean-up costs incurred by the Parole Board constitute consequential damages, and the District Court's restitution order cannot be supported by § 3663A(b)(1).

Quillen relies heavily on *United States v. Mitchell*, 876 F.2d 1178 (5th Cir.1989), for the proposition that the costs of restoring property to its pre-offense condition may not be recovered under the MVRA. The defendant in *Mitchell* was convicted of offenses involving three stolen trucks. The District Court ordered the defendant to pay restitution to the victims (the vehicle owners). Though some of the victims were reimbursed by their insurance policies, the District Court awarded restitution in varying amounts; *e.g.*, the difference in the value of the trucks at the time of the theft and the time they were returned, lost income, the cost to restore one of the trucks to working condition, and attorney's fees.

---

**4.** Our decision in *Davis* involved restitution ordered under the MVRA's companion statute, the Victim and Witness Protection Act, 18 U.S.C. § 3663. *Id.* at 44–45. However, the "language of § 3663(b)(1) (the VWPA) and § 3663A(b)(1) (the relevant portion of the MVRA) is *identical* in all relevant respects. Therefore, absent unique and highly persuasive MVRA legislative history, of which there is none, Third Circuit cases interpreting the language of § 3663(b)(1) control...." *Simmonds*, 235 F.3d at 830–31 n. 2.

The Fifth Circuit held that the restitution award was incorrect.

> Section 3663(b)(1) limits restitution in property cases to return of the property or, if that is inadequate, to the value of the property when stolen less its value when returned. There is no provision authorizing restitution for lost income, *cost of restoring property to its pre-theft condition*, or cost of employing counsel to recover from an insurance company.

*Id.* at 1184 (emphasis added). Seizing on this language, Quillen argues that the restitution award in this case – the cost of restoring the mail room to its pre-offense condition – similarly is not authorized by § 3663A(b)(1).

We note, however, the decisions of other courts (in cases involving damaged but not stolen property) that approve restitution for repair costs, provided the victim is not compensated twice for the same injury. For example, in *United States v. Sharp*, 927 F.2d 170 (4th Cir.1991), the defendants, striking mineworkers, were ordered to pay restitution for damage caused by a bomb they detonated near the entrance to a mine site. The District Court imposed restitution for the replacement cost of the damaged property, the cost of supplies and labor to make the repairs, taxes on the payroll, and loss of income. The Fourth Circuit relied on *Mitchell* and remanded for the District Court to remove the costs of lost income from the restitution award, but it affirmed the award of repair costs.

> [The defendants] also argue that the inclusion of the cost of repairs was improper. We disagree. The language of the statute provides that the defendant must pay an amount equal to the value of the property on the date of the damage. Defendants assert that the value of the property was $30,000, which represents the replacement cost of the fan. This value, however, fails to take into account the fact that the fan that was damaged had been installed as part of the mine property. Moreover, other parts of the mine property, including the mine itself, were damaged. The district court properly took into account the entire amount of damage to all the property injured as a result of the bombing. Therefore, the inclusion of repair costs was not error.

*Id.* at 174.

More recently, in *United States v. Menza*, 137 F.3d 533 (7th Cir.1998), the defendant pleaded guilty to various drug offenses related to a laboratory in his apartment that was discovered when fire rescue personnel were summoned for a medical emergency. After the defendant was taken to the hospital, the responding officer, wary of the chemicals and equipment in the home lab, called a hazmat team. It arrived and secured the site – capping potentially explosive materials, ensuring all other chemicals were sealed, *etc.* – and left the scene closed until other law enforcement officers returned with a search warrant. A DEA agent later searched the premises pursuant to a warrant and removed certain evidence of contraband. According to DEA regulations, all other items, including chemicals both hazardous and ordinary, were turned over to an independent environmental clean-up company for destruction and disposal. The owner of the apartment also incurred additional clean-up and replacement costs. The District Court later imposed restitution costs for all of the expenses of the chemical disposal company and many of the clean-up expenses of the landlord. *Id.* at 534–36.

The Seventh Circuit remanded for the District Court to determine several missing findings made necessary by the following restitution principles. First, restitution may be ordered only for costs that

were directly related to the crimes charged in the information and, second, the Government must provide sufficient documentation and explanation for the victims' claimed losses. *Id.* at 538–39. Third, noting that many courts have held investigatory costs are not compensable as restitution, the Seventh Circuit directed the District Court to consider whether the DEA's costs to clean up, destroy, and dispose of the chemicals "were matters of routine policy and procedure within the agency, which may prevent recovery, or whether the costs incurred were unique to this case and accrued solely and directly as a result of Menza's criminal conduct." *Id.* at 539. Finally, the landlord had hired an environmental company to address the alleged contamination in the apartment, and sought reimbursement for this expense. But "both the DEA and [the landlord] submitted costs for what appears to be similar assessment and/or clean-up procedures. If the district court finally determines that Menza is liable for some or all of the environmental assessment and clean-up costs, he should bear that burden only once and not twice." *Id.* In other words, in its remand order the *Menza* Court implicitly approved restitution for clean-up costs, so long as the defendant was not required to pay duplicate expenses.

Quillen has attempted to distinguish his case from *Sharp* and *Menza.* He argues *Sharp* does not instruct us because it was undisputed that the explosives used by the striking mineworkers actually damaged the victim's property. Quillen also contends that the Government's reliance on *Menza* is misplaced because it stands for the proposition that before ordering restitution a district court must determine (i) whether any actual damage has occurred, and (ii) whether the claimed clean-up costs

were necessary and reimbursed only once. To that end, he asserts for the first time in his reply brief that the Government has mischaracterized the facts of this case when it claims that restitution was for the costs incurred by the Dauphin County hazmat team. Quillen notes that the Dauphin County hazmat team did respond to the anthrax threat, but the invoice for clean-up expenses that the Government submitted to the District Court was for services rendered by Palmer Construction Company. The record is silent, he argues, as to why clean-up efforts were needed beyond those provided by the County hazmat team, which is relevant because the Government's claim assumes there was not a duplicative decontamination effort. Accordingly, Quillen requests that we vacate the restitution order and remand for an evidentiary hearing to determine whether the Board's property actually was contaminated by Quillen's conduct and, if so, whether the expense incurred in the two cleanups – the first by the Dauphin County hazmat team, the second by Palmer Construction – is recoverable.

■ Quillen's latter argument – his alternate request for remand – is untenable. As a procedural matter, arguments not raised in an appellant's opening brief are deemed waived. *Abdul–Akbar v. McKelvie,* 239 F.3d 307, 316 n. 2 (3d Cir.2001) (en banc). But even analyzed on equitable grounds, this is not a compelling claim for relief. Prior to Quillen's sentencing, the Government submitted to the District Court an invoice from Palmer Construction Company itemizing the supplies necessary to decontaminate the mail room as well as the cost breakdown between materials ($2,001.55) and labor ($2,025.00 for 40.5 hours).[5] The District Court ordered

---

5. At oral argument Quillen's counsel pointed

out that this invoice was dated October 19,

Quillen to pay the Parole Board for a single hazmat clean-up expense of $4,026.55, thus indicating that the Government did not seek a duplicative reimbursement for the expenses of the Dauphin County Hazardous Materials Team and that Quillen properly bore this burden but once.

■ Quillen's substantive arguments are likewise unpersuasive. Most significantly, the linchpin of his appeal – that only "actual damages" are compensable under the MVRA – is not supported by that statute or the caselaw interpreting it. Quillen asserts that the plain language of the MVRA, which allows restitution only "in the case of an offense resulting in damage to . . . property of a victim of the offense," 18 U.S.C. § 3663A(b)(1), precludes recovery in this circumstance, where his conduct did not damage the victim's property. We disagree. "Damage" is commonly understood to be "something done or suffered that reduces the value or usefulness of the thing affected or spoils its appearance." Oxford American Dictionary 214 (1980). There is no question that Quillen's ostensible contamination of the Parole Board's mail room effectively eliminated that facility's usefulness until proved to be contamination free.

Moreover, we have construed the MVRA as limiting restitution to "actual losses . . . directly resulting" from the defendant's criminal conduct. *Davis*, 43 F.3d at 45.[6] Were it not for Quillen's letter and its contents (though thankfully benign), the Parole Board would never have conceived of the need to enlist hazmat services in its mail room. But for Quillen's conduct, the Parole Board would not have incurred an actual loss of $4,026.55, the cost of decontaminating a room believed to be tainted by a deadly substance.

To cap matters, Quillen's proffered actual damages standard has little real-world value, especially here, where the victim cannot know whether the damage is actual until after it is incurred; *i.e.*, the claim that his conduct did not actually damage the Parole Board's property can only be made in hindsight. His letter was opened, and the fake anthrax dispersed, on October 19, 2001. Immediately the area was sealed off, clean-up efforts initiated, and the material sent for testing. Quillen admitted the real nature of the substance on October 22nd, but the test results did not confirm it was harmless until October 26th.[7] For obvious reasons the Parole Board did not wait until this time to decontaminate its mail room. Granted, the Parole Board hired a private contractor to perform emergency hazmat services on a mess that ultimately could have been removed with a broom and dustpan. But

2001, the same day the Parole Board opened the letter, and thus was only the estimated cost of the cleanup. But the Government at oral argument produced a second invoice, dated January 29, 2002, from Palmer Construction billing the Parole Board $4,026.55 (as estimated) for the emergency hazmat cleanup of suspected anthrax completed on October 19, 2001.

6. One could argue that "damages" and "losses," though intuitively synonymous, are dissimilar. The argument would be that the mail room was not actually damaged, but that the Parole Board incurred expenses (losses) to confirm that was the case. But this cuts too fine a line. For under our facts, damages and losses are treated the same analytically. They must be actual (not mere possibilities) and directly attributable to the criminal conduct. The hazmat costs are both.

7. We are mindful that the Parole Board employees exposed to the letter's contents had to endure for at least three days the apprehension that their lives were at risk, and it would be another four days before authorities could verify Quillen's assurance that the substance was fake. This form of loss may not be readily quantified, but it is not any less actual.

Quillen's argument – that the expense of this expeditious (but in hindsight literally unnecessary) response did not result in an actual loss directly resulting from his conduct – ignores the exigencies of the situation, that this fake attack occurred at the same time real anthrax mailings were causing fatalities elsewhere (not to mention that it occurred on the heels of the September 11, 2001 terrorist attacks).

\*      \*      \*      \*      \*      \*

We reiterate that restitution must be limited to "an amount pegged to the *actual* losses suffered by the victims of the defendant's criminal conduct," and "based upon *losses directly resulting* from such conduct." *Davis*, 43 F.3d at 45. We also agree with those courts that hold clean-up or repair costs may be ordered under the MVRA, provided the defendant is not required to compensate the victim twice for the same loss. *See Menza*, 137 F.3d at 539; *Sharp*, 927 F.2d at 174. Applying these principles, the restitution ordered by the District Court was proper. The itemized invoices of the services provided by Palmer Construction establish that the clean-up expense borne by the Parole Board was an actual loss directly resulting from Quillen's conduct. In addition, there is no evidence indicating the Parole Board is to be reimbursed by Quillen for the costs of both the Dauphin County hazmat team and Palmer Construction. Accordingly, we affirm the judgment of the District Court.