**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

ROSE BROCK-DAVIS,
          *Defendant-Appellant.*

No. 06-30565

D.C. No.
CR 06-0021 DWM

OPINION

Appeal from the United States District Court
for the District of Montana
Donald W. Molloy, District Judge, Presiding

Argued and Submitted
August 7, 2007—Seattle, Washington

Filed October 2, 2007

Before: William C. Canby, Jr., A. Wallace Tashima, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Tashima

13375

**COUNSEL**

John Rhodes, Assistant Federal Defender, Missoula, Montana, for the defendant-appellant.

Michael S. Lahr, Assistant United States Attorney, Helena, Montana, for the plaintiff-appellee.

**OPINION**

TASHIMA, Circuit Judge:

This case is an appeal by Rose Brock-Davis ("Brock-Davis") of an order of restitution to cover, among other things, testing and cleanup costs for a motel room she occupied during the course of a conspiracy to manufacture methamphetamine. Restitution was imposed pursuant to the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A. The parties agree that this statute applies and we accept their agreement that it applies. We address in turn Brock-Davis' multiple contentions.

Brock-Davis contends, first, that there was no statutory authorization for the restitution imposed, because the MVRA does not authorize remediation costs for a motel room. Second, she argues that the motel was not a "victim" of her offense as defined by the MVRA. Third, she contends that there was an intervening cause of the loss to the motel that prevents her from being liable for restitution. Fourth, she urges that inconsistencies in the amounts requested invalidate them. Fifth, she argues that she should not have been liable for lost income. Finally, she contends that she should not have

been held liable for costs related to asbestos testing performed at the motel because these costs were not directly related to her offense of conviction. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We affirm in part and vacate in part and remand.

In sum, Brock-Davis' first four contentions are unpersuasive but, as to the fifth and sixth issues, we conclude that the district court erred when it awarded restitution for the motel's lost income from the motel room and when it required restitution for the total amount of the unsegregated bill, which included asbestos-related costs. Accordingly, the restitution order will be vacated and remanded as to the issues of lost income and asbestos-related costs.[1]

## I. BACKGROUND

Brock-Davis was charged with conspiracy to manufacture methamphetamine in violation of 21 U.S.C. § 841(a)(1) and 846 (Count 1), and several fraud and identity theft counts (Counts 2 through 5). She pled guilty without a plea agreement to Counts 1 through 4, and Count 5 was dismissed with prejudice upon the government's motion. Count 1 charged that the conspiracy between Brock-Davis and her co-defendant, Perry Carl Willingham, occurred "[o]n or about October 18, 2005, at or around Missoula, in the State and District of Montana."

As outlined at the plea colloquy, Brock-Davis and Willingham checked into a motel room in Missoula, Montana, on October 15, 2005. While they were absent from the room, on

---

[1]Brock-Davis also raises a claim under *Booker v. United States*, 543 U.S. 220 (2005), but she acknowledges that this claim is barred by current Circuit precedent, *see United States v. Bussell*, 414 F.3d 1048, 1060 (9th Cir. 2005) ("In contrast to its application of the Sentencing Guidelines, the district court's orders of restitution and costs are unaffected by the changes worked by *Booker*."), and she wishes simply to preserve it. We note that the claim is raised and we reject it.

October 18, 2005, a housekeeper discovered such items as a white powdery substance on the bathroom vanity, and identification cards, in the room. These items were reported to the manager and then to police. Brock-Davis and Willingham were apprehended soon thereafter. In a search of the trunk of their car, police found precursors to the manufacture of methamphetamine such as cold tablets and beakers, and found a liquid that tested positive for methamphetamine. The police also found a microwave oven and other items in the motel room.

Willingham told police after he was arrested that they had "better check room 107 at the Aero Inn in Kalispell" ("Room 107"). This information was relayed to the Kalispell Police Department, and Kalispell detective Brian Fulford investigated this report. In Room 107, Fulford discovered an ice bucket with dark purple stains both on the bottom and floating in clear liquid, an empty box for a microwave oven, a white powdery substance, and other items he considered indicative of a meth lab. He called the Northwest Drug Task Force and advised them that there was a meth lab in Room 107. A motel clerk identified Brock-Davis as the individual who had rented the room.

The pre-sentence investigation report ("PSR") included a recommendation of restitution to the Aero Inn. At the sentencing, Brock-Davis objected to that recommendation. The government then called the owner and manager of the Aero Inn, Gilbert Bissell, to testify in support of restitution. Bissell testified about what was found in Room 107, the initial cleaning and testing of the room, and that he and his housekeeper spent two days cleaning the room with bleach, upon the advice of the police.

Bissell further testified that approximately one month later he received a letter from the Montana Department of Environmental Quality ("DEQ"), informing him that Room 107 was listed as a "hazardous meth site" on the basis of reporting

from a law enforcement agency. The letter specified that Bissell could have the room de-listed by having it decontaminated as provided in the Montana Administrative Rules. He forwarded to DEQ a copy of the police report and a record of the testing he had initially conducted, but DEQ responded by telling Bissell that the entity that had conducted the testing was not one of its recognized test agencies and that Bissell would have to have the room inspected and cleaned by a recognized agency. Bissell then selected WTR Consulting Engineers ("WTR") from DEQ's approved list to do the methamphetamine testing and cleanup work. After testing, cleaning, and some negotiations, Bissell, WTR, and DEQ created a scope of work, which DEQ approved. The room's adjoining doors were disposed of, along with furniture and other items, and Bissell received a letter from DEQ stating that Room 107 was no longer a hazardous site.

For purposes of restitution, Bissell claimed amounts in damages including miscellaneous furnishing replacement charges, and $7,186 to be paid to WTR. He testified that these costs were an accurate listing of the costs incurred in order to satisfy DEQ and to be able to rent Room 107. Bissell also estimated that the closure of Room 107 for cleaning resulted in lost revenue of $4,000, which he determined through a formula of the room being shut for approximately six months, with an occupancy rate during those winter months of 40 percent, and similar room rentals of $40-$50 per night. He also stated, however, that because the room was closed during the winter rather than the summer, he "had the luxury of not renting it." Bissell further allocated $120 in wages for the time that he and his housekeeper spent cleaning the room with bleach.

With respect to asbestos testing WTR conducted, the government conceded in its questioning at the sentencing hearing that "[n]o one is contending [that the asbestos testing that was done] has a direct relationship to a methamphetamine cooking operation," and elsewhere that the asbestos testing "was not

directly related to the meth." In explanation of the asbestos costs, Bissell simply indicated that DEQ had requested asbestos testing and that if asbestos had been present, the motel would "have had to hire another special contractor to deal with the asbestos removal." Consistent with this testimony, the WTR reports reflected that asbestos testing and cleanup had been conducted which was "[i]n addition to the [m]eth cleanup and decontamination." In total, ceiling panels from Room 107 and from four other rooms and a storage area were tested for asbestos. Brock-Davis was ordered to pay $125 to replace ceiling tiles removed for asbestos testing, as well as the unsegregated WTR bill.

In support of her position in the sentencing proceedings, Brock-Davis relied on an affidavit and testimony from forensic scientist Gene Gietzen, who commented on the evidence collected and concluded that he "[could not] state within a reasonable degree of scientific certainty that th[e items found in Room 107] would constitute a meth lab." Gietzen also commented on alternative remediation techniques that WTR could have employed, but he admitted that the type of testing in which WTR engaged would be necessary to tell whether there had been a meth lab in a location. With respect to the asbestos testing, Gietzen assented to defense counsel's characterization that it had nothing to do with methamphetamine. Noting that the ceiling was tested for methamphetamine, moreover, Gietzen indicated that "asbestos was part of the construction, *not related to any potential meth lab that could or could not have been in that room.*" (Emphasis added.)

The court sentenced Brock-Davis to a term of imprisonment of 32 months, 3 years of supervised release, and ordered restitution, which included $13,248.45 to the Aero Inn for the cleanup costs and a fraud claim.

## II.　STANDARD OF REVIEW

The legality of an order of restitution is reviewed *de novo*, and factual findings supporting the order are reviewed for

clear error. *United States v. Hackett*, 311 F.3d 989, 991 (9th Cir. 2002); *United States v. Stoddard*, 150 F.3d 1140, 1147 (9th Cir. 1998). Provided that it is within the bounds of the statutory framework, a restitution order is reviewed for abuse of discretion. *Hackett*, 311 F.3d at 991; *Stoddard*, 150 F.3d at 1147.

## III.  DISCUSSION

### A.  *Statutory Authorization*

Brock-Davis argues, first, that the district court erred in imposing restitution as to Room 107 because the MVRA does not authorize restitution to remediate a motel room. Courts cannot order restitution without statutory authorization, *United States v. DeSalvo*, 41 F.3d 505, 511 (9th Cir. 1994); *United States v. Hicks*, 997 F.2d 594, 600 (9th Cir. 1993), and " '[the] starting point in every case involving construction of a statute is the language itself,' " *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 685 (1985). We begin our analysis with the language of the MVRA, and we conclude that there was statutory authorization for the restitution in this case.

[1] The MVRA limits restitution for an offense resulting in damage to or loss or destruction of property to either the return of the property or, if that is "impossible, impracticable, or inadequate," to payment of "the greater of . . . the value of the property on the date of the damage, loss, or destruction; or . . . the value of the property on the date of sentencing, less . . . the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1). Because of the similarities between the MVRA and the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663, we may look to cases decided under the VWPA for guidance in interpreting the MVRA. *See United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004); *United States v. Grice*, 319 F.3d 1174, 1177 (9th Cir. 2003).

In a case upon which Brock-Davis relies, the Fifth Circuit stated that under the VWPA's comparable language, "[t]here is no provision authorizing restitution for . . . *cost of restoring property to its pre-theft condition* . . . ." *United States v. Mitchell*, 876 F.2d 1178, 1184 (5th Cir. 1989) (emphasis added). Brock-Davis also contends that, had the MVRA authorized such restitution, Congress would not have had to enact legislation which explicitly authorizes the imposition of restitution for cleanup of clandestine methamphetamine sites in 21 U.S.C. § 853(q). *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 537 (1994) ("It is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." (alteration, internal quotation marks and citation omitted)).[2]

**[2]** We have, however, specifically authorized restitution comparable to the restitution ordered here. *See United States v. De La Fuente*, 353 F.3d 766 (9th Cir. 2003). In that case, the indictment charged "mailing threats to injure" as a result of the defendant's mailing of two letters suspected to contain anthrax. *Id.* at 768. One of the letters was intercepted by the post office. *Id.* The government sought restitution for the post office, which opened the letter and suffered costs of evacuation, lost employee work hours, and cleanup costs; for the hazmat team's cost of responding to the incident; and for the health department's cost of testing the letters. *Id.* at 768-69. The defendant contended that these costs were not recoverable under the MVRA because the damage did not constitute harm within the meaning of the statute. *Id.* at 771.

In rejecting this contention, we pointed to the observation in *Hackett* that the MVRA "directs that both physical injury

[2]Section 853(q) provided, at the time relevant to the offense, that "[t]he court, when sentencing a defendant convicted of an offense . . . involving the manufacture of amphetamine or methamphetamine, shall . . . order restitution to any person injured as a result of the offense . . . ." 21 U.S.C. § 853(q)(3).

and financial loss are compensable," *id.* at 774 (quoting *Hackett*, 311 F.3d at 992 (internal quotation marks omitted)), and, after mentioning the portions of the MVRA quoted above, we reasoned:

> Although these calculation instructions are not easy to apply where property is rendered temporarily unusable, rather than completely destroyed or permanently damaged, we agree with the Third Circuit that in this specific factual situation *the district[ ] court's 'only practical option was to order [the defendant] to pay the cost of ensuring that the mail room was in the same condition as just prior to the time it became unusable.'*

*Id.* at 774 n.6 (quoting *United States v. Quillen*, 335 F.3d 219, 222 (3d Cir. 2003)) (emphasis added).

In the Third Circuit case to which we referred, the court similarly affirmed an order of restitution under the MVRA to cover cleanup costs by a hazmat team employed by the recipient of a letter, the parole board, in the case of an anthrax scare caused by the defendant's mailing that contained (innocuous) white powder. *Quillen*, 335 F.3d at 220-26. In *Quillen*, the defendant relied on *Mitchell*, 876 F.2d 1178, the same case on which Brock-Davis relies, but the Third Circuit declined to follow it by simply "not[ing] . . . the decisions of other courts (in cases involving damaged but not stolen property) that approve restitution for repair costs, provided the victim is not compensated twice for the same injury." *Quillen*, 335 F.3d at 223 (collecting cases).

**[3]** Noting that the MVRA mandated recovery for "damages" to property and reasoning that "[t]here is no question that [the defendant's] ostensible contamination of the Parole Board's mail room effectively eliminated that facility's usefulness until proved to be contamination free" and thereby damaged it, *id.* at 225, the court agreed with the Fourth and

Seventh Circuits holdings that "clean-up or repair costs may be ordered under the MVRA . . . ." *Id.* at 226 (quoting *United States v. Menza*, 137 F.3d 533, 539 (7th Cir. 1998); *United States v. Sharp*, 927 F.2d 170, 174 (4th Cir. 1991)). We also agree with these Circuits.[3]

**[4]** Accordingly, we reject Brock-Davis' contention that the restitution award against her lacked statutory authorization. Although "restitution in a criminal case may only compensate a victim for actual losses caused by the defendant's criminal conduct," *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 926 (9th Cir. 2001) ("*Gamma Tech*"), "[t]he primary and overarching goal of the MVRA is to make victims of crime whole." *Gordon*, 393 F.3d at 1048; *see also Hughey v. United States*, 495 U.S. 411, 416 (1990) (noting that "the ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event"); *Gordon*, 393 F.3d at 1053 ("[T]he 'purpose of restitution is . . . to restore the defrauded party to the position he would have had absent the fraud.' "); 18 U.S.C. § 3664(f)(1)(A). The restitution award was statutorily authorized here.

---

[3]These holdings are consistent with our holding in *Hackett*, 311 F.3d 989, that 21 U.S.C. § 853(q) authorized restitution for property damage caused by a fire that resulted from the operation of a meth lab in a rental house. There, Hackett pled guilty to aiding and abetting the manufacture of methamphetamine based on a meth lab he operated with his co-defendant. *Id.* at 990-91. A fire ensued when his co-defendant placed on a hotplate a jar of chemicals, which exploded, while Hackett was not present. *Id.* at 991. At sentencing, the district court ordered the defendants to pay $47,997.74 restitution to the insurance company that paid that amount to the owner for damages to the house in which the lab had been located. *Id.* Because § 853(q) provides for restitution "as provided in [§ 3663A]," 21 U.S.C. § 853(q)(3), it seems clear that § 3663A authorizes comparable restitution in a case even where a meth lab has not actually been in existence. *See De La Fuente*, 353 F.3d at 774 (citing *Hackett*); *Hackett*, 311 F.3d at 991-92 (rejecting argument based on distinction between § 853(q) and the MVRA). Accordingly, Brock-Davis' attempt to distinguish *Hackett* on the ground that there was no meth lab in Room 107 is unavailing. 21 U.S.C. § 853(q) specifically incorporates the MVRA and easily coexists with it. *See* 21 U.S.C. § 853(q)(3).

## B. *Presence of a "Victim"*

Second, Brock-Davis contends that Bissell does not qualify as a "victim" under the MVRA. Specifically, Brock-Davis argues that Bissell was not directly and proximately harmed by the criminal conduct to which she pled guilty, which was a conspiracy to manufacture methamphetamine in Missoula, Montana on or about October 18, 2005. As Brock-Davis points out, Room 107 of the Aero Inn is located in a separate motel in *Kalispell*, Montana — not in Missoula —, and Gietzen suggested that there was no proven manufacturing of methamphetamine in Room 107. In addition, the indictment and the plea hearing did not mention Kalispell, the Aero Inn, or Bissell. Although this Circuit has warned against the risk of vague allegations in an indictment in *DeSalvo*, 41 F.3d at 514, we reject Brock-Davis' argument that the indictment did not encompass any Kalispell conduct and that Bissell was not a proper "victim."

In accordance with the general rule that "the government has the burden of establishing by a preponderance of the evidence that the victim's damages were caused by the conduct of which the defendant was convicted," *United States v. Rice*, 38 F.3d 1536, 1540 (9th Cir. 1994); *see also* 18 U.S.C. § 3664(e), there is language in the case law that seems to support Brock-Davis' position, and to which she points. For instance, we have noted that " '[e]ven where the offense of conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction.' " *United States v. Reed*, 80 F.3d 1419, 1423 (9th Cir. 1996) (quoting *United States v. Sharp*, 941 F.2d 811, 815 (9th Cir. 1991).

This language, however, stems from cases, such as *Sharp*, which interpreted the VWPA as it stood before it was amended in 1990. *See Reed*, 80 F.3d at 1423 (quoting *Sharp*). In 1990, the Supreme Court held that restitution may be ordered under the VWPA "only for the loss caused by the

specific conduct that is the basis of the offense of conviction." *Hughey*, 495 U.S. at 413. However, Congress amended the VWPA in response to *Hughey* to overrule this holding, in part. *Reed*, 80 F.3d at 1423. "After the amendment [to the VWPA in 1990], restitution may be ordered for losses to persons harmed in the course of the defendant's scheme *even beyond the counts of conviction.*" *United States v. Rutgard*, 116 F.3d 1270, 1294 (9th Cir. 1997) (emphasis added); *see also United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999) (same); *United States v. Johnson*, 132 F.3d 1279, 1286-87 (9th Cir. 1997) (same).[4] Accordingly, in detailing those to whom it mandates restitution, the MVRA provides:

> [T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct *in the course of the scheme, conspiracy, or pattern.*

18 U.S.C. § 3663A(a)(2) (emphasis added).

 **[5]** In other words, "when the crime of conviction includes a scheme, conspiracy, or pattern of criminal activity as an element of the offense, . . . the restitution order [may] include *acts of related conduct for which the defendant was not convicted.*" *Lawrence*, 189 F.3d at 846-47 (emphasis added) (affirming an award of restitution for the full amount in a fraud scheme, including "related conduct" in the amount of $574,700, even though only $60,411 of that amount was "directly attributable to the acts for which the jury found [the defendant] guilty"). *See also Grice*, 319 F.3d at 1175-79

---

[4]Because the MVRA and VWPA utilize the same definition of victim, our interpretation of the definition is the same for both the VWPA and the MVRA. *See Grice*, 319 F.3d at 1177-78.

(affirming an award of restitution for the full fraud scheme even though the defendant only pled guilty to part); *Johnson*, 132 F.3d at 1286-87 (affirming an award of restitution for the full fraud scheme even though the defendant only pled guilty to two counts thereof). Thus, Brock-Davis' contention that restitution ordered under § 3663A can only be based on conduct specifically included in the offense of conviction is no longer correct.

Even were the law of restitution not more expansive for convictions for conspiracy than for other crimes, the district court would not have committed clear error in finding that the same conspiracy was at issue in Missoula and Kalispell. The evidence disclosed the existence of two partial meth labs (in the first hotel room and in Room 107) being created by Brock-Davis and Willingham at the same time — with one room containing the microwave and the other containing the microwave box — and items in the trunk of the car in which Brock-Davis and Willingham were apprehended that would have supplemented either lab (or even have constituted the lab itself) at the motels Brock-Davis and Willingham chose. In addition, Willingham pointed the police to the Aero Inn in Kalispell after his arrest, and Brock-Davis had checked into that room — which contained evidence consistent with the existence of a meth lab, as even defense witness Gietzen acknowledged.

Finally, the fact that the Aero Inn was not mentioned in the indictment is immaterial. *See United States v. Dickerson*, 370 F.3d 1330, 1339 (11th Cir. 2004) ("[T]he courts have held that restitution may be ordered to a victim not named in the indictment . . . .") (collecting cases); *United States v. Hensley*, 91 F.3d 274, 277 (1st Cir. 1996) (finding restitution proper when a scheme is involved "without regard to whether the *particular criminal conduct* of the defendant which directly harmed the victim was alleged in a count to which the defendant pled guilty, *or was even charged in the indictment*") (second emphasis added) (citation omitted); *Rice*, 38 F.3d at

1545 (declining to find "a per se rule that restitution is limited to victims specifically named in the indictment"); *United States v. Angelica*, 859 F.2d 1390, 1395 (9th Cir. 1988) ("The trial court did not err in basing the restitution order on victims not charged in the indictment."); *see also United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000) (finding restitution payable under the MVRA "by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions").

**[6]** On these bases, it is clear that Bissell was a "victim" under the MVRA of Brock-Davis' crime of conviction.

## C. *Intervening Cause*

Third, Brock-Davis contends that the "excessive and ridiculous cleanup costs imposed by DEQ" constituted an intervening cause of the loss to the Aero Inn and render the restitution amount unwarranted. "[T]he main inquiry for causation in restitution cases becomes whether there was an intervening cause and, if so, whether this intervening cause was directly related to the offense conduct." *United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999). In this inquiry, " '[t]he causal chain may not extend so far, in terms of the facts or the time span, as to become unreasonable.' " *Hackett*, 311 F.3d at 993 (quoting *Gamma Tech*, 265 F.3d at 928 (citations omitted)).[5] We reject Brock-Davis' contention.

---

[5]As a separate point warranting mention, there is no substantiation for Brock-Davis' argument that Montana's cleanup protocol is "unknown and apparently totally arbitrary" and may have been misapplied to her case. In addition, this argument was not presented to the district court. The occurrence of negotiations to determine what items would be disposed of, and Bissell's testimony that he thought the case would be disposed of earlier than it was, do not demonstrate that DEQ's procedures were arbitrary or cast doubt on the costs Bissell incurred.

**[7]** Courts have regularly awarded restitution for cleanup and remediation costs as they were incurred, and even, in *De La Fuente* and *Quillen*, in cases involving a suspected chemical that turned out to be harmless. *See, e.g.*, *United States v. Phillips*, 367 F.3d 846, 850 (9th Cir. 2004) (environmental investigation and cleanup costs) (Clean Water Act); *De La Fuente*, 353 F.3d at 768-74; *Quillen*, 335 F.3d at 220-26; *United States v. Sablan*, 92 F.3d 865, 867, 870-71 (9th Cir. 1996) (restoring bank's computer files to their condition before tampering); *United States v. Koenig*, 952 F.2d 267, 275 (9th Cir. 1991) ("expenses incurred in connection with the bank's reprogramming of [ ] stolen ATM account information"); *United States v. Kenney*, 789 F.2d 783, 784 (9th Cir. 1986) (technician's fee for removing film from surveillance camera). Moreover, we reasoned in *De La Fuente* that "[a] cleanup and decontamination effort conducted by local emergency response agencies . . . was a necessary and foreseeable result of [the defendant's] offense conduct" and that "*[n]o independent intervening cause [could] be blamed for the [agencies'] losses.*" *De La Fuente*, 353 F.3d at 773 (emphasis added); *see also Quillen*, 335 F.3d at 225-26.

**[8]** To this end, Brock-Davis assumed the risk that DEQ would impose extensive costs and requirements for cleanup. As we have reasoned (in a fraud case), "[t]hough the extent of [the defrauded company's] loss may have been affected by outside forces, [the defendant]'s conduct — and his alone — directly resulted in the loss." *Gordon*, 393 F.3d at 1055; *see United States v. Rhodes*, 330 F.3d 949, 953 (7th Cir. 2003). The same reasoning is applicable here. To take an example, in *Rice*, 38 F.3d 1536, we affirmed a restitution order when the victim of a fraudulent products scheme impounded its entire inventory of products from the defendant's source, even though it was not proven that the entire inventory had been contaminated. *Id.* at 1540-41. In so doing, we explicitly rejected a claim that the victim company had disrupted the chain of causation on the basis that its warehouse was poorly organized because "whether or not [the victim] might have

been able to mitigate its damages . . . affords the criminal perpetrator no excuse. A crime victim is not required to mitigate damages." *Id.* at 1542 (citation omitted). Analogously, because Bissell had to undergo the expenditure he did to remediate the motel room at DEQ's request in order to continue to use the room as a result of Brock-Davis' criminal conduct, the loss was properly placed on Brock-Davis.

Moreover, this case is distinguishable from the Seventh Circuit's decision in *Menza*, 137 F.3d 533, upon which Brock-Davis relies, because the government is not seeking reimbursement simply for routine costs. *Compare id.* at 539. The losses here were properly treated as a direct result of Brock-Davis' offense conduct, and not a government decision. *See Hackett*, 311 F.3d at 993 ("Although there are multiple links in this causal chain, the district court did not err by finding that [the defendant's] conduct was directly related to the cause of the fire."). Because " '[a] restitution order is authorized if the defendant created the circumstances under which the harm or loss occurred,' " *Meksian*, 170 F.3d at 1263 (quoting *United States v. Spinney*, 795 F.2d 1410, 1417 (9th Cir. 1986)), restitution was properly ordered. *See also United States v. Keith*, 754 F.2d 1388, 1390, 1393 (9th Cir. 1985) (awarding restitution to assault victim for lost wages after she quit her job because any possible intervening case was "directly related to the assault").[6]

---

[6]By way of contrast, this case is distinguishable from the circumstances warranting the reversal of restitution orders in *Meksian* and *United States v. Tyler*, 767 F.2d 1350 (9th Cir. 1985), where the intervening cause was not directly related to the offense of conviction. The intervening cause in *Meksian* was an inaccurate environmental report about property used as collateral for a loan, where the defendant was prosecuted for separate false statements on the loan which did not affect the value of the collateral. *Meksian*, 170 F.3d at 1261-63. In *Tyler*, the defendant was convicted of conspiracy to commit timber theft, and was ordered to pay restitution for the amount of loss in the timber's value from the time of the cutting to the time of the government's sale of the timber (after it had been retained for evidentiary purposes). *Tyler*, 767 F.2d at 1351. We found that this restitu-

## D.  *Factual Discrepancies*

Fourth, Brock-Davis contends that factual discrepancies undermine and require reduction of the restitution amount. We disagree.[7]

**[9]** We reject her challenge based on purported discrepancies in Bissell's statement of the amounts spent to replace carpeting and other items. Bissell made an overall statement of his final request's accuracy that Brock-Davis fails to discredit. There was no clear error, and no plain error, in the district court's finding.

Brock-Davis also argues that there are discrepancies between the items that were disposed of and those for which she was charged. Although the government fails to provide any substantive response to these arguments, we conclude that the district court did not clearly err in accepting Bissell's testimony that the victim statement accurately reflected what items were required to be disposed of, notwithstanding the cited inconsistencies reflected in various other documents. There was no impeachment of Bissell's credibility or any evidence that specific furnishings were not necessary replacements or that Bissell could have avoided these disposal or replacement costs. Bissell was involved in all aspects of the methamphetamine cleanup, and he attempted to limit his costs. Accordingly, these arguments fail. *See Rice*, 38 F.3d at

tion award was reversible because "[t]he timber was restored to the government on the day of the theft. Any reduction in its value stems from the government's decision to hold the timber during a period of declining prices, not from Tyler's criminal acts." *Id.* at 1352. Here, although DEQ may have demanded more remediation than Brock-Davis would have preferred, there was no intervening cause that removes her responsibility for the damage.

[7]Several of Brock-Davis' arguments are reviewed for plain error because she did not raise them below.

1542 (finding that it was not clear error for the district court to credit the victim's explanation of the loss).

[10] Thus, although "the government must provide the district court with more than just . . . general invoices . . . ostensibly identifying the amount of their losses," *Menza*, 137 F.3d at 539, the government's burden of proof has been met. In making this assessment, we note that in *Menza*, which Brock-Davis cites, the bills that had been submitted appeared duplicative and showed "clear inconsistencies." *Id.* at 529, 538. Because Bissell's loss statement did not contain such pronounced red flags, Brock-Davis' case is distinguishable from *Menza* and her arguments are unpersuasive. *See id.* at 540.

## E. *Lost Income*

[11] Fifth, we agree with Brock-Davis that the district court erred by ordering restitution for consequential damages for lost income due to Bissell's inability to rent Room 107 during the cleanup. As it did in the sentencing hearing for Brock-Davis' co-defendant, the government now concedes that the $4,000 in lost income should not have been included in the restitution order. For one thing, the motel did not lose any income because it always had other rooms available to rent during the slow winter season. Even if the motel had lost income, moreover, lost revenue is a consequential damage and is excluded from restitution in cases such as this. *See* 18 U.S.C. § 3663A(b)(1); *Stoddard*, 150 F.3d at 1147; *Sablan*, 92 F.3d at 870. Accordingly, the portion of the restitution order awarding $4,000 in recovery for lost income is vacated. *See also Hicks*, 997 F.2d at 601 n.7 (adopting concession).

## F. *Asbestos*

Finally, we are persuaded by Brock-Davis' contention that she is not liable for the asbestos testing that WTR conducted and the associated ceiling tile replacement cost, to the extent that these charges were not directly related to the offense con-

duct. *See Gamma Tech*, 265 F.3d at 928; *Meksian*, 170 F.3d at 1263.

**[12]** As Brock-Davis points out, the government's statements before the district court strongly suggest that it recognized that she did not directly cause the asbestos testing that was included in the DEQ-demanded remediation. The government explicitly stated during its examination of Bissell that "[n]o one is contending [that the asbestos testing that was done] has a direct relationship to a methamphetamine cooking operation." In addition, Gietzen testified that asbestos testing was "not related to any potential meth lab that could or could not have been in that room," and he agreed that testing for asbestos did not "have anything to do with methamphetamine." Because WTR presented an unsegregated lump-sum bill to the court, however, the restitution ordered included asbestos testing costs and the cost for ceiling tile replacement from this testing.

**[13]** Contrary to the government's contention on appeal, there was no explanation below — whether from Bissell or otherwise — that linked the asbestos testing to the methamphetamine cleanup. The testimony to which the government refers indicated simply that DEQ wanted asbestos testing done in addition to methamphetamine testing. The government now contends that the asbestos testing was necessary in case items containing asbestos had to be removed due to methamphetamine contamination, which would have required a special contractor to handle the asbestos and, on that basis, was directly related to the methamphetamine testing and cleanup plan. Although evidence to this effect might justify the inclusion of asbestos-testing costs in the restitution order, no such showing has been made. In addition, the government's assertion is strongly belied by the WTR reports' statement that the asbestos testing was "in addition to" the methamphetamine concern and by the fact that a storage area and four rooms *other than Room 107* were tested for asbestos.

**[14]** Thus, we conclude that the district court clearly erred in awarding full recovery on WTR's unsegregated bill. We vacate the payment of restitution as it relates to the tested ceiling tiles and WTR, and remand to the district court for additional consideration of this issue. On remand, a determination should be made whether the asbestos testing and ceiling tile replacement can be linked to the methamphetamine contamination and, even if they can properly be linked, a breakdown must be done as to how much of the associated costs can be attributed specifically to Room 107. *See, e.g.*, *Hicks*, 997 F.2d at 602 (ordering the district court "to recalculate the amount of the restitution ordered").

## IV.  CONCLUSION

For the foregoing reasons and as set forth herein, the order of restitution is

**AFFIRMED in part, VACATED in part, and REMANDED.**